Estate of A. C. Lineberger, Deceased, J. Harold Lineberger, Executor, v. Commissioner.
Estate of A. C. Lineberger v. Commissioner
Docket No. 36217.
United States Tax Court
1954 Tax Ct. Memo LEXIS 264; 13 T.C.M. (CCH) 252; T.C.M. (RIA) 54091; March 26, 1954
*264 Held, transfers of property made by the decedent between 1935 and 1947 were not made in contemplation of death within the meaning of section 811 (c) of the Internal Revenue Code. Leon L. Rice, Jr., Esq., W. P. Sandridge, Esq., and C. W. Womble, Esq., for the petitioner. Newman A. Townsend, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined a deficiency in estate tax of $625,504.63. The only question for our determination is whether the transfers of property made by the decedent, A. C. Lineberger, in each of the years between 1935 and 1947 were made in contemplation of death within the meaning of section 811 (c) of the Internal Revenue Code *265 . Certain subsidiary matters dependent on the above question will be settled by agreement of the parties under Rule 50 or Rule 51 of this Court. The estate tax return in suit was filed with the collector of internal revenue for the district of North Carolina. Findings of Fact The stipulated facts are so found and the stipulation is included herein by this reference. A. C. Lineberger, the decedent, was born in Gaston County, North Carolina, on September 25, 1858, and died on December 29, 1947, at the age of 89, a resident of Belmont, North Carolina. The last will of decedent was executed on June 22, 1921, and left his estate to his wife and seven children. The will provided, in part: "If any of my children shall not have received a good education before my death, I direct my Executors and Trustees to expend so much of my estate as may be necessary to provide for them a good college education. No charge shall be made against any of my children for any money expended by me during my life or by my Executors or Trustees after my death for or on account of the education of my children and no charge shall be made against any of my children for any money expended by me for their *266 traveling expenses, either in this country or abroad. "No charge shall be made against my wife, Martha J. Lineberger, for or on account of any gifts of property, real or personal, that I have heretofore made to her, but I hereby will and direct that the principal of any gifts of property, real and personal, that I may hereafter make to my said wife shall be accounted for and charged to her without interest and that the principal of any gifts of property, real or personal, that I have heretofore given or may hereafter give to any of my children shall be accounted for and charged to them respectively, without interest, in the division of my estate hereinafter provided for. "I give, bequeath and devise all of the residue of my property, real, personal and mixed, of every description and wheresoever situated, to my wife, Martha J. Lineberger, my daughter, J. Elizabeth Lineberger and my son, Archibald C. Lineberger, and the survivors and survivor of them, and their successors hereinafter mentioned, to have and to hold the same for and during the minority of my youngest child, in trust for the use and benefit of my said wife and all of my children as hereinbefore and hereinafter provided. *267 I hereby authorize and empower [the trustees] to manage and control all of said property and to collect and receive the rents, dividends, interest, income and profits therefrom until my youngest child shall attain the age of twenty-one (21) years, and to use so much thereof as may be necessary for the support of my said wife and my dependent children. * * * When my youngest child attains the age of twenty-one (21) years, said Executors and Trustees shall divide my estate equally between my said wife and each of my children, after having charged my wife with the principal of any gifts of property which I may hereafter make to her and having charged each of my children with the principal of any gifts of property which I have heretofore made to them or may hereafter make to them, but no interest shall be included in such charge or charges." Codicils providing minor changes to his will were made by the decedent on August 22, 1935, and on August 5, 1939. The father of the decedent was instrumental in building and operating one of the first cotton spinning mills in North Carolina. Because of the losses incurred by his father after the Civil War, the decedent was required to cut short *268 his education in order to work in his father's mills. In the early 1880's the mills went into receivership and the decedent's family resorted to working its farm for a livelihood. About 1885 the decedent left the farm and again went to work in the textile business in North Carolina. He was successful in operating textile mills, and between 1905 and 1929 he was one of the principal organizers of 14 textile companies in North Carolina. By 1947, the year of his death, the decedent was being paid as president of 15 companies chiefly in the textile field. Between 1935 and 1947 the decedent's yearly gross income averaged close to $93,000. His total gross income for this period was $1,205,814.25. The decedent came of a long-lived family. His father died at the age of 96 and his mother at the age of 86. Three of his sisters lived to be 81, 83, and 86 years of age. Another sister was 96 years old in 1952 and was still living at the time of the hearing of this case. The decedent was married in 1898 at the age of 40. His wife, who was 19 years old when decedent married her, died in 1946. They had nine children, one of whom died at birth, another at an early age. The decedent's seven surviving *269 children were born between 1899 and 1910, and they were married between 1928 and 1938. The decedent provided liberally for the living expenses, education, and travel of his children. Each of his children attended school to the college level, and five of them traveled in Europe. While in school or traveling none of the children was restricted to an allowance of a certain amount of money for his needs; each was permitted to draw checks directly on a bank account of the decedent. The decedent's four sons after completing their formal educations went to work in mills in which their father had interests. In 1935 the decedent was 77 years of age. Between 1935 and 1945 his health was good. In 1936 at the age of 78 the decedent went on a motor trip to Florida with a few members of his family and rode about 500 miles the first day. He took up golf when he was 65 years old and played until 1937, when he was 79 years old. At home he frequently chopped wood for the fireplace in his living room and liked to prune the trees on his grounds. Between 1935 and 1945 he was actively engaged in conducting his many business interests. His day's work included visits to a few textile mills. He would walk *270 to those mills near his office; those more distant he would reach by automobile. His usual routine was to walk through the mills in order to observe their operations, and he would discuss operations with the mill superintendents. Until 1944 the decedent regularly attended and presided at meetings of the textile corporations of which he was president. In 1945 the decedent was operated on for the removal of a blood clot on his brain, and from this time until his death in December 1947, his health gradually worsened, but he was able to continue in business, though less actively, until a short time before he died. Although his visits were less frequent, he continued to visit textile mills. He would be driven to the mills and discuss operations with the mill superintendents from his automobile. The decedent's disposition and his general outlook were healthy; he maintained an active interest in his family, home, and business. Between 1919 and 1935 the decedent occasionally made gifts to his wife and children. Before 1921 he gave $2,000 worth of bonds and war savings stamps to each of his seven children, and $4,000 worth to his wife. In 1921 he gave each of his children $15,000 in stocks *271 of various mills in which he was interested. Between 1921 and 1934 he made seven other gifts of shares of stocks to a few of his children. Between 1935 and 1947 the decedent made gifts in almost every year to his children. In the same period he also made a few gifts to his wife. (It is these gifts to his wife and children between 1935 and 1947 which are in controversy here.) In the early part of this period some of the gifts to his children were of money for their use in buying or paying for homes, or gifts of houses and lots. Most of the gifts between 1935 and 1947 were of shares of stock in mills in which the decedent was interested. The following schedule shows the number of donees, the average amount of decedent's gifts to each donee, the decedent's gross income and the value of his gifts in each year between 1935 and 1947: Number
Average
Value
of
Gift to
of Gifts
Gross Income
Year
Donees
Each Donee
(When Made)
of Decedent
1935
8
$ 8,760.37
$ 70,082.99
$ 69,829.15
1936
6
7,680.66
46,083.92
95,220.96
1937
3
8,577.00
25,731.00
103,625.83
1938
1
20,000.00
20,000.00
74,518.80
1939
8
6,946.69
55,573.50
80,682.82
1940
8
25,987.95
207,903.60
106,265.49
1941
8
18,358.43
146,867.50
95,243.83
1942
7
16,607.17
116,250.20
108,814.30
1943
7
6,502.30
45,516.00
90,056.67
1944
7
8,850.00
61,950.00
92,580.32
1945
7
3,000.00
21,000.00
87,416.58
1946
7
3,000.00
21,000.00
90,944.81
1947
30
2,800.00
84,000.00
110,614.71
$921,958.71
$1,205,814.27
*272 The total reported gross estate of the decedent was $536,908.62. The transfers of property made by the decedent between 1935 and 1947 were not made in contemplation of death. Opinion In computing the value of the estate of a decedent for federal estate tax purposes, the Internal Revenue Code requires the inclusion in the estate of the value of any property transferred without adequate consideration by the decedent in contemplation of death. See section 811 (c) (1) (A). The meaning of the expression "in contemplation of death" has continued to be the subject of recurring litigation since its first inclusion in the federal estate tax law. [1] In United States v. Wells, 283 U.S. 102 (1931) the phrase was defined as follows: "The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, * * *" (p. 118); and "Death must be 'contemplated', that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition." (p. 117); and "It is sufficient if 'contemplation of death' be the inducing cause of the transfer whether or not death is believed to be near." (p. 119). *273 We must determine, then, what the decedent's impelling motive was in making these transfers of property to his family. Generally this is best determined from the decedent's own statements or expressions of his intention at the time of making the transfers; then from the conditions surrounding the transfers, such as the decedent's age and his frame of mind or outlook on life, his physical condition as he knew it, the past generosity of the decedent, the relationship to the decedent of the transferees and their financial conditions, and any other circumstances which in the particular case may be fairly interpreted as indicative of the decedent's motive or intention in making the transfers. The record contains little testimony or other evidence as to any statements of the decedent which may throw some light on his motive or intention in making the transfers in question. There is, however, evidence on behalf of the petitioner tending to deny the existence of a "contemplation of death motive." The gifts which are questioned by the respondent were made in each year between 1935 and 1947. Most of these gifts were of shares of stock in textile mills in which the decedent was interested; *274 others were gifts of money, houses and lots and other property. This pattern of yearly giftmaking is not of itself indicative of the decedent's state of mind in making the gifts. The practice takes on an importance, however, if begun at a time when it is less likely that the gifts were made in contemplation of death (because of the decedent's age or physical condition or other circumstances); then it may be reasonably inferred that the later gifts in the series were made to carry out the decedent's original purpose. One of the chief characteristics of the decedent here, as shown by the evidence, was his longstanding generosity toward his family. He made full provision for his children's formal education; each of them had the opportunity of traveling abroad. While in school or traveling, the children's living expenses were liberally provided for by the decedent. Sometime before 1921 the decedent gave each of his children $2,000 worth of bonds and war savings stamps, and $4,000 worth to his wife. In 1921 he gave each of his children shares of stock worth $15,000 and $22,500 in stocks to his wife. In addition, the decedent made several other gifts of stock between 1923 and 1934 to a few *275 of his children. It is apparent, therefore, that the decedent's generosity toward his family did not begin in 1935, but was amply displayed long before this time. A reasonable inference that may be drawn from this showing is that his later gifts were merely a continuation of his earlier generosity to his family and were not prompted by the thought of death. In 1935, the first year in question here, the decedent's children were between 25 and 36 years of age. All of the children were married between 1928 and 1938, so that the early years of the gift-making period in question here coincided to some extent with the early years of the married lives of the decedent's children. Also, these early years of his children's married lives were late years in the decedent's life, since he did not marry until he was 40 years old, and he was 77 years old in 1935. As suggested by the testimony of the decedent's oldest daughter, it is doubtless true that an important motivation for the decedent's generosity in these early years was his desire to give financial assistance to his children at a time in their adult lives when their needs would most likely be greatest. Between 1935 and 1940 the decedent *276 made gifts of cash to six of his children for the purchase of homes, while another was given a house and lot. Two of the decedent's married daughters were given automobiles in 1936. All of these gifts, the respondent contends, were made in contemplation of death. The bulk of the decedent's gifts to his children was shares of stock in mills which he helped to establish. His four sons worked in some of these mills. One of the sons testified that in making gifts of stock in these mills his father advised him that he should invest in the textile mills in the area, and that he should have a financial interest in any mill in which he worked. When we consider the important part the decedent played in establishing so many textile mills in the area of North Carolina where he lived, it is natural that he would be interested in fostering in his children, particularly his sons, an interest in his own life's work. Considering the testimony of one of decedent's doctors and others who saw him frequently, we have no doubt that the decedent was in good health between 1935 and 1945. He engaged in physical activities that would be considered vigorous for a much younger man. He was actively engaged *277 in business, which required not only a mental alertness, but also involved much moving about in order to observe the operations of the mills in which the decedent was interested. In addition to his good physical condition, the decedent seemed to have a well-adjusted disposition. Until his death he maintained an active interest in his family, his home and his work, and despite his years he seemed to have no anxiety about death. The age of the decedent in 1935 when he first started to make the gifts in question here was 77, and the gifts continued until his death in 1947 at the age of 89. The age of a decedent at the time of making gifts is ordinarily an important consideration in contemplation of death cases, since at an advanced age one is more likely to make transfers of his property which are substitutes for testamentary disposition. Here, however, we think that the decedent's old age is a consideration of lesser importance. The decedent came of a longlived family. He often expressed the hope that he would live longer than his father, who died at 96, and that he would live to be 100 years old. We doubt, therefore, that the decedent's age was a controlling consideration in his gift-making. *278 Between 1945 and 1947, the year of his death, the decedent's health became worse. He had a brain clot in 1945, and from this time on he experienced temporary periods of forgetfulness. Yet despite this illness the decedent was still able to go about his business, though less actively, until the time he died. We need go no further in suggesting likely motives for the decedent's transfers, since we think that on the basis of the evidence already mentioned the petitioner has met the burden of proving that the transfers made by the decedent between 1935 and 1947 were not made in contemplation of death. Decision will be entered under Rule 50. Footnotes
1. Section 202 (b), Revenue Act of 1916, 39 Stat. 777.↩